IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBERT JAHODA,<br><br>                Plaintiff,<br><br>   v.<br><br>FASHION NOVA, LLC,<br><br>                Defendant. | Case No. |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Robert Jahoda, by and through his undersigned counsel, seeks a permanent injunction requiring a change in Fashion Nova, LLC's ("Defendant") corporate policies to cause its online store to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

**GENERAL BACKGROUND**

1. This lawsuit is calculated to enforce Robert Jahoda's right to access the goods and information offered on Defendant's Fashion Nova mobile application.

2. Robert Jahoda ("Jahoda," "Plaintiff" or "he/him") has been blind for his entire adult life.

3. Mr. Jahoda recognizes that evolving digital technologies present an unprecedented opportunity for him and the vision impaired community to have increased independent access to goods and services – so long as those technologies are, in fact, accessible.

4. The National Federation of the Blind has highlighted this fact as follows:

> Individuals with disabilities often rely on websites to overcome the systemic transportation, communication, architectural, and other barriers that pervade our society. A blind person can review and save coupons using a website that would have otherwise required a sighted assistant. A deaf or hard-of-hearing person can

> participate in a conversation through a Web-based platform more freely than they would be able to in person. Many autistic people can more independently review information about a store's offerings online. And the 24-hour-a-day availability of information and transactions on websites provides a level of independence and convenience that cannot be replicated through any other means.
>
> The lack of accessible websites has far reaching effects on virtually every aspect of the lives of individuals with disabilities . . . .

See Amicus Brief filed on behalf of the National Federation of the Blind, et al., in *Winn-Dixie Stores, Inc. v. Juan Carlos Gil*, Case No. 17-13467 (11th Cir. Dec. 20, 2017).[1]

---

[1] Citations in this complaint refer to "websites" while Plaintiff seeks to use a mobile application. This distinction is not material. The World Wide Web Consortium (also known as "W3C") has created the most broadly-used standards for digital accessibility, the Web Content Accessibility Guidelines (WCAG). W3C's website states:

> [T]he vast majority of user interface patterns from desktop/laptop systems (e.g. text, hyperlinks, tables, buttons, pop-up menus, etc.) are equally applicable to mobile. Therefore, it's not surprising that a large number of existing WCAG 2.0 techniques can be applied to mobile content and applications (see Appendix A). Overall, WCAG 2.0 is highly relevant to both web and non-web mobile content and applications.
>
> That said, mobile devices do present a mix of accessibility issues that are different from the typical desktop/laptop. The "Discussion of Mobile-Related Issues" section, below, explains how these issues can be addressed in the context of WCAG 2.0 as it exists or with additional best practices. All the advice in this document can be applied to mobile web sites, mobile web applications, and hybrid web-native applications. Most of the advice also applies to native applications (also known as "mobile apps").
>
> Note: WCAG 2.0 does not provide testable success criteria for some of the mobile-related issues. The work of the Mobile Accessibility Task Force has been to develop techniques and best practices in these areas. When the techniques or best practices don't map to specific WCAG success criteria, they aren't given a sufficient, advisory or failure designation. This doesn't mean that they are optional for creating accessible web content on a mobile platform, but rather that they cannot currently be assigned a designation. The Task Force anticipates that some of these techniques will be included as sufficient or advisory in a potential future iteration of WCAG.
>
> The current document references existing WCAG 2.0 Techniques that apply to mobile platform (see Appendix A) and provides new best practices, which may in the future become WCAG 2.0 Techniques that directly address emerging mobile accessibility

5. To access mobile applications, Jahoda uses VoiceOver screen reader software,[2] which "translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y. 2017) (J. Weinstein):

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*.; *See also* American Foundation for the Blind, *Screen Readers*, *available at* https://www.afb.org/blindness-and-low-vision/using-technology/assistive-technology-products/screen-readers (last accessed January 23, 2025) (discussing screen readers and how they work).

6. Jahoda is an experienced and competent user of screen reader software.

7. He is aware of the Department of Justice's longstanding position that the Americans with Disabilities Act ("ADA") requires that mobile applications be accessible to individuals with vision impairments.

---

challenges such as small screens, touch and gesture interface, and changing screen orientation.

See Mobile Accessibility: How WCAG 2.0 and Other W3C/WAI Guidelines Apply to Mobile, W3C First Public Working Draft 26 February 2015, Section 1.1, at https://www.w3.org/TR/mobile-accessibility-mapping/, (Last accessed January 23, 2025).
[2] "VoiceOver" is screen reader software included in iOS, the operating system on Apple's iPhone.

8. Based upon his personal experiences and knowledge, Jahoda is also aware that a significant percentage of mobile applications that offer goods and services to the public have material access barriers which limit or altogether prevent a vision-impaired individual's access to the applications.

9. Jahoda believes that the importance of accessible technologies to him personally and to the vision-impaired community generally was amplified during the recent pandemic. He believes that as the world becomes more dependent upon digital technology and takes a permanent step away from brick-and-mortar businesses, the vision-impaired community risks being left behind.

10. To ensure his continued access to goods and services in the digital economy, Jahoda has filed this lawsuit (and other similar lawsuits) calculated to enforce his federal rights under the ADA.

11. In this lawsuit and in other similar cases, Jahoda would never agree to a resolution unless it included material improvements to accessibility and ongoing monitoring by his counsel to ensure that those improvements are implemented and maintained.

## ACCESSIBILITY BARRIERS ON DEFENDANT'S MOBILE APPLICATION

12. Defendant sells apparel and accessories on its mobile application.

13. Defendant is responsible for the policies, practices and procedures concerning the mobile application's development, maintenance and content.

14. Within the relevant limitation period, Plaintiff attempted to access Defendant's mobile application using VoiceOver screen reader software on his iPhone.

15. Defendant's mobile application was unusable by Plaintiff as a result of myriad access barriers, which are described in detail at Paragraph 21 of the Complaint

16. Web-based technologies have features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible application will not cause the application to remain accessible without a corresponding change in corporate policies related to those web-based technologies. Jonathan Lazur et al., *Ensuring Digital Accessibility Through Process and Policy 140* (2015). As one leading commentator notes,

> The most significant problem is maintaining the accessibility of a large commercial site. Without policies, procedures and metrics—such as testing a release for accessibility before posting to the website and training in accessible design (so that accessibility is part of the design process the way, say, cybersecurity is)—the site's status as accessible will be temporary at best.

*Fighting for Accessible Websites under the ADA: Daniel Goldstein, Brown Goldstein Levy, Baltimore*, Bloomberg BNA, Jan. 13, 2016, ISSN 1098-5190 (reproduced with permission from Electronic Commerce & Law Report, 21 ECLR, 2, 1/13/16).

17. To evaluate whether an inaccessible mobile application has been made materially more accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful manner that will cause the mobile application to remain accessible, the mobile application must be reviewed on a periodic basis with end user testing by disabled individuals.

> [I]f you have planned to redesign or add a certain segment to your site, then make it accessible from the start. It's far cheaper to plan for an elevator than to decide to add one once your 30-story building is complete. Or if you are re-branding, consider using templates that will ensure accessibility. Make sure you have policies, procedures and metrics in place so that you know if you are maintaining accessibility and can identify why, if you are not. Most of all, consult disabled consumers or a consumer organization before deciding what you are going to do, and have consumers actually test the changes.
>
> Something you imagine you may need to do, you may not need to do at all or may be able to do much cheaper. Something you hadn't thought to do may be critical to accessibility. And, of course, if you work with the disability community, they will

spread the word that this is no longer a site to be avoided, but to be used.

*Id*. at 3.

18. Against the above backdrop, Plaintiff files this Complaint to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

## JURISDICTION AND VENUE

19. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

20. Defendant participates in the Commonwealth's economic life by clearly performing business over the Internet. Through its mobile application, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These online sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *see also Access Now Inc. v. Otter Products, LLC*, 280 F.Supp.3d 287 (D.

Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

21. As described in additional detail below, Plaintiff has been injured when he attempted to access Defendant's mobile application from this District but encountered barriers that denied him full and equal access to Defendant's online goods and content. These digital barriers also interfere with Plaintiff's full and equal enjoyment of the goods and services offered through the application. The barriers detailed below are not a comprehensive catalog of the mobile application's accessibility deficiencies.

    a. The application includes a link in the upper right corner, styled as a simple image of a clock face with an arrow indicating counterclockwise movement.



Users clicking this image will navigate to a page displaying recently viewed items. This link is unlabeled and not formatted as a link – VoiceOver users will hear no indication of the link's purpose when focusing on it;

b.   As pictured above, the Home tab of the application's header includes links labeled, *inter alia,* "Women," "Plus+Curve," "Men," and "Kids." Sighted users will correctly understand that they can navigate to categories of products by activating

8

    these links. These links are formatted as plain text, meaning VoiceOver users will hear no indication that these are elements with which they can interact;

c. As pictured above, sighted users navigating to the Men section of the application will see an image with the text:

        40% OFF EVERYTHING

        USE CODE: LOVE 40

        SHOP NOW

VoiceOver users focusing on this image will hear "In Progress." They will not be made aware of the existence of the sale or the discount code. Such users will find this barrier repeated throughout the application;

d. The application uses struck through text to indicate price reductions.



Sighted customers will understand that the struck through number is the item's original price, and the standard text number is the reduced price. VoiceOver software does not distinguish between struck through and standard text, and its users will hear no indication of the significance of the two numbers;

e. The application displays the number of ratings a product has received and the averages of those ratings.



For example, sighted customers will see that 237 users have rated Defendant's Cornell Stacked Skinny Flare Jeans, and that the average rating for the product is four out of five stars. VoiceOver users focusing on this element will hear "two hundred thirty-seven" but will not be informed that this indicates the number of shoppers who have reviewed the product and will not hear the product's average star rating.

22. Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

23. Plaintiff is and, at all times relevant hereto, has been a resident of this District. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

24. Defendant is a California limited liability company doing business at 2801 East 46th Street, Vernon, CA 90058.

## HARM TO PLAINTIFF

25. If the mobile application was accessible, Plaintiff could independently research and purchase Defendant's products. He has attempted to access the mobile application and has been unable to use the mobile application as a result of material access barriers. While he desires to access the mobile application to assess Defendant's product offerings, prices and other information, he is deterred from continuing to attempt to use the mobile application.

26. Though Defendant purports to have centralized policies regarding the maintenance and operation of its mobile application, Defendant has never had a plan or policy that is reasonably calculated to make its mobile application accessible to, and independently usable by, individuals with vision related disabilities. As a result, the access barriers on the mobile application are ongoing and likely to persist.

27. The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these access barriers. Removal of the barriers identified above is readily achievable and

may be carried out without much difficulty or expense. Many other online retailers offer their goods and/or services through accessible mobile applications.

28. Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and in a manner that is compatible with screen reader technology.

**SUBSTANTIVE VIOLATION**
**Title III of the ADA, 42 U.S.C. § 12181 *et seq*.**

29. The assertions contained in the previous paragraphs are incorporated by reference.

30. Defendant's mobile application is a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018) ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the property upon which the alleged discrimination has taken place—i.e., its mobile application. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III.").

31. In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its mobile application, it has violated the ADA.

32. In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public

accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

33. Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service or fails to provide a like experience to the disabled person.

34. Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

35. In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time: as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

36. By failing to provide its mobile application's content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

> (a) denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its mobile application;

14

  (b) affording individuals with visual disabilities access to its mobile application that is not equal to, or effective as, that afforded others;

  (c) utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

  (d) denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

  (e) failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

37. Defendant has violated Title III by, without limitation, failing to make its mobile application's services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the mobile application, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

38. Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its mobile application to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

39. Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's mobile application nor result in making the mobile application different but enables individuals with visual disabilities to access the mobile application Defendant already provides.

40. Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

41. Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

42. Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for:

(A) A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its mobile application is fully accessible to, and independently usable by, individuals with visual disabilities;

(B) A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its mobile application into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its mobile application is accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law;

(C) Payment of costs of suit;

(D) Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the

judgment. *See People Against Police Violence v. City of Pittsburgh*, 520 F.3d 226, 235 (3d Cir. 2008) ("This Court, like other Courts of Appeals, allows fees to be awarded for monitoring and enforcing Court orders and judgments."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191); *see also Access Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11);

(E) Whatever other relief the Court deems just, equitable and appropriate; and

(F) An Order retaining jurisdiction over this case until Defendant has complied with the Court's Orders.

Dated: January 27, 2025

Respectfully Submitted,

/s/ *R. Bruce Carlson*
R. Bruce Carlson (PA 56657)
Ian M. Brown (PA 20180)
**CARLSON BROWN**
222 Broad St.
PO Box 242
Sewickley, PA 15143
bcarlson@carlsonbrownlaw.com
ibrown@carlsonbrownlaw.com
(724) 730-1753

*Counsel for Plaintiff*